# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM B. PRUITT, | CASE NO. 1:07-cv-01709-AWI-SKO PC |
| Plaintiff, | FINDINGS AND RECOMMENDATIONS RECOMMENDING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT BE DENIED, AND DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT BE GRANTED |
| v. | |
| CLARK, et al., | |
| Defendants. | (Docs. 49 and 52) |
| _____/ | THIRTY-DAY OBJECTION DEADLINE |

### Findings and Recommendations on Cross-Motions for Summary Judgment

## I.    Procedural History

Plaintiff William B. Pruitt, a state prisoner proceeding pro se and in forma pauperis, filed this civil rights action pursuant to 42 U.S.C. § 1983 on November 26, 2007.  This action for damages is proceeding on Plaintiff's amended complaint, filed on January 15, 2010, against Defendants Swinford, Bonilla, Lara, Curtiss, and Wan for violation of the Fourth Amendment arising out of the routine cross-gender strip searches which occurred in the work change area at California Substance Abuse Treatment Facility and State Prison (CSATF) in 2007.[1]

On January 3, 2012, Plaintiff filed a motion for summary judgment.  Defendants filed an opposition to the motion on January 17, 2012, and Plaintiff filed a reply on February 8, 2012.  Defendants then filed a cross-motion for summary judgment on April 2, 2012, and Plaintiff filed an

---

[1] Defendants Swinford and Lara were misidentified as Swimford and Laura in the amended complaint.

opposition on May 1, 2012.[2]  The cross-motions for summary judgment have been submitted upon the record, and these findings and recommendations now issue.  Local Rule 230(l).

## II.   Legal Standard

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mutual Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011).  Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1) (quotation marks omitted).  While the Court *may* consider other materials in the record not cited to by the parties, it is not required to do so. Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified School Dist., 237 F.3d 1026, 1031 (9th Cir. 2001).

In resolving cross-motions for summary judgment, the Court must consider each party's evidence. Johnson v. Poway Unified School Dist., 658 F.3d 954, 960 (9th Cir. 2011).  Plaintiff bears the burden of proof at trial, and to prevail on summary judgment, he must affirmatively demonstrate that no reasonable trier of fact could find other than for him. Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  Defendants do not bear the burden of proof at trial and in moving for summary judgment, they need only prove an absence of evidence to support Plaintiff's case. In re Oracle Corp. Securities Litigation, 627 F.3d 376, 387 (9th Cir. 2010).

In judging the evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, Soremekun, 509 F.3d at 984 (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, Comite de

---

[2] In addition to the notice of the requirements for opposing a motion for summary judgment provided by the Court on September 23, 2010, Defendants provided notice to Plaintiff in their motion, in compliance with the recently issued opinion in Woods v. Carey, Nos. 09-15548, 09-16113, 2012 WL 2626912 (9th Cir. Jul. 6, 2012).

2

1   _Jornaleros de Redondo Beach v. City of Redondo Beach_, 657 F.3d 936, 942 (9th Cir. 2011)

2   (quotation marks and citation omitted).

3   **III.    Parties' Cross-Motions for Summary Judgment**

4           **A.    Plaintiff's Motion**[3]

5                   **1.    Allegations**

6           Plaintiff's Fourth Amendment claims arise from two cross-gender visual body cavity searches

7   (referred to hereinafter as cross-gender strip searches) allegedly conducted on February 27 and 28,

8   2007, at the "B" facility work change area at CSATF.  (Doc. 8, Amend. Comp.)  Present for the

9   searches were three female correctional officers and one male correctional officer.  The searches

10  occurred when Plaintiff returned to his housing unit on "B" facility from the Correctional Treatment

11  Center (CTC), which is on the prison grounds but outside of the housing unit.

12          Inmates leaving "B" facility for the CTC must go through work change.  When Plaintiff left

13  "B" facility for his medical appointment at the CTC on February 27, 2007, he went through a metal

14  detector but was not strip searched.  Upon his return, Defendants Swinford, Lara, and Bonilla, who

15  were female correctional officers, and John Doe, a male correctional officer, were conducting strip

16  searches of inmates.  Defendant Swinford told Plaintiff to "go through the motions," which required

17  Plaintiff to remove all of his clothing, lift up his arms, open his mouth, lift up his testicles, turn

18  around, lift his feet, and bend over, spread his buttocks, and cough.  (Amend. Comp. ¶¶13, 14.)

19  Plaintiff voiced his discomfort to the male officer but complied with the directive because he did not

20  want to get written up.

21          On February 28, 2007, Plaintiff had to return to the CTC to see a doctor and he was again

22  strip searched in front of "the female defendants" upon his return.  (Id., ¶19.)

23          On March 2, 2007, Plaintiff submitted an inmate appeal regarding the cross-gender strip

24  searches.  On March 26, 2007, Plaintiff received a phone call from Defendant Curtiss, a sergeant

25  who was in charge of work change.  Defendant Curtiss interviewed Plaintiff regarding his inmate

26  appeal, and he informed Plaintiff that their union allows female officers to occupy positions in work

27

28          [3] Plaintiff's motion is not verified, but it is supported by Plaintiff's declaration and other evidence.

1  change where inmates will be undressing and that female officers have the right to occupy the work

2  change positions because they are not gender specific.

3     Defendant Wan, an associate warden, was in charge of work change policies and was aware

4  of the situation, but he failed to stop the cross-gender strip searches and he signed off on Defendant

5  Curtiss's investigation of Plaintiff's inmate appeal at the first level of review.

6              **2.    Legal Standard for Fourth Amendment Claims**

7     The Fourth Amendment prohibits only unreasonable searches.  Bell v. Wolfish, 441 U.S. 520,

8  558, 99 S.Ct. 1861 (1979); Byrd v. Maricopa County Sheriff's Office, 629 F.3d 1135, 1140 (9th Cir.

9  2011); Michenfelder v. Sumner, 860 F.2d 328, 332 (9th Cir. 1988).  The reasonableness of the search

10 is determined by the context, which requires a balancing of the need for the particular search against

11 the invasion of personal rights the search entails.  Bell, 441 U.S. at 558-59 (quotations omitted);

12 Byrd, 629 F.3d at 1141; Bull v. City and Cnty. of San Francisco, 595 F.3d 964, 974-75 (9th Cir.

13 2010); Nunez v. Duncan, 591 F.3d 1217, 1227 (9th Cir. 2010); Michenfelder, 860 F.2d at 332-34.

14 Factors that must be evaluated are the scope of the particular intrusion, the manner in which it is

15 conducted, the justification for initiating it, and the place in which it is conducted.  Bell, 441 U.S.

16 at 559 (quotations omitted); Byrd, 629 F.3d at 1141; Bull, 595 F.3d at 972; Nunez, 591 F.3d at 1227;

17 Michenfelder, 860 F.2d at 332.

18    In analyzing these factors, the cross-gender nature of the search is a critical consideration.

19 Byrd, 629 F.3d at 1143.  It has long been recognized "that the desire to shield one's unclothed figure

20 from the view of strangers, and particularly strangers of the opposite sex, is impelled by elementary

21 self-respect and personal dignity," id. at 1141 (citing York v. Story, 324 F.2d 450, 455 (9th Cir.

22 1963)) (internal quotation marks and alternations omitted), and the Ninth Circuit recently stated that

23 the "litany of cases over the last thirty years has a recurring theme: cross gender strip searches in the

24 absence of an emergency violate an inmate's right under the Fourth Amendment to be free from

25 unreasonable searches," id. at 1146.

26

27

28

### 3.   <u>Plaintiff's Statement of Undisputed Facts</u>[4]

1. Defendant Swinford worked at CSATF for approximately seven or eight years, and during her time at CSATF, she was assigned to the "B" facility work change area, on and off.

2. Defendant Swinford was assigned to the "B" facility work change area on February 27, and 28, 2007.

3. At times, Defendant Swinford was inside the work change area while inmates underwent unclothed body searches.

4. The distance between Defendant Swinford and inmates undergoing unclothed body searches varied depending on where she was located, but if she was standing at a counter processing gate passes and doing other tasks, the distance between herself and the inmate being searched was approximately 6 feet.

5. There were occasions when Defendants Lara and Bonilla worked in the work change area and at times, they were inside the work change area when unclothed body searches were being conducted.

6. Sometimes when male officers conducting unclothed body searches were overwhelmed by the great number of searches to perform, Defendant Swinford would assist by doing things such as inspecting the inmate's clothing.

7. Defendant Swinford stated that she never saw any inmates disrobed and naked in the work change area.

8. Approximately 450 inmates are processed on Wednesdays, approximately 300 inmates are processed regular days, and approximately 100 inmates or fewer are processed on weekends.

9. Staff assigned to the work change area would search the clothing of inmates being processed through and would conduct visual inspections of the inmates, and the clothing searches would generally be conducted by the same officer conducting the visual inspection.

---

[4] Those facts which were redundant, unsupported by evidence, or brought into dispute by Defendants have been omitted. Where supported by evidence, the Court has retained in this section those facts which Plaintiff offered as undisputed. However, Plaintiff is proceeding pro se and based on his motion, his declaration, and his verified amended complaint, it is clear that Plaintiff is not conceding that Defendants did not strip search him, despite his inclusion in this section of Defendants' stated position that they did not.

10.   Defendant Swinford stated that she stood on the opposite side of the counter from the inmates, some distance away and facing the opposite direction of the inmates, and processed gate passes and answered the phone; she stated that she could not see unclothed inmates.

11.   Defendant Bonilla worked at CSATF for approximately four months.

12.   Defendant Bonilla was assigned to "B" facility work change on February 27, and 28, 2007.

13.   Defendant Bonilla was in the work change building while inmates underwent unclothed searches.

14.   Staff conducting unclothed body searches of inmates in the "B" facility work change building at CSATF could look over the counter to see the inmates disrobing.

15.   Defendant Bonilla stated that during her time in the work change building, she stood some distance away with her back to the inmates and she would process gate passes and answer the phone.

16.   During Defendant Bonilla's employment at CSATF, staff who worked in the "B" facility work change area and conducted unclothed body searches of inmates would inspect each item of the inmates' clothing and visually inspect their bodies.

17.   The number of officers working in the "B" facility work change at one time varied, but during the time of Defendant Bonilla's employment, there were normally three staff members working at a time.

18.   Defendant Bonilla stated that she stood on the opposite side of the counter from the inmates, some distance away and facing the opposite direction of the inmates, and processed gate passes and answered the phone; she stated that she could not see unclothed inmates.

19.    Defendant Bonilla was assigned to work inside "B" facility work change and she would identify the inmates coming into work change and she would answer the phone.

20.   Defendant Lara worked at CSATF for approximately seven years.

21.   Defendant Lara was assigned to "B" facility on February 28, 2007.

22.   Defendant Lara worked in the work change building while inmates underwent unclothed body searches.

///

23. During her time working in the "B" facility work change area, Defendant Lara would be inside the work change building while inmates were processed through the building.

24. Pursuant to departmental policy, inmates assigned to designated areas such as vocational programs, industries, plant operation, warehouse, outside crews, etc. may be subject to unclothed body searches before returning to the institution's general population.

25. Defendant Curtiss has worked for the California Department of Corrections and Rehabilitation (CDCR) since 1997 and he became a supervisor in 2001.

26. Female officers are permitted to work in the "B" facility work change area.

27. There have been occasions when three female officers have been assigned to the work change area.

28. Defendant Curtiss was assigned to investigate Plaintiff's inmate appeal, log number SATF-B-01054, and he interviewed "B" facility work change staff.

29. Defendant Curtiss interviewed Defendant Lara.

30. "B" facility work change staff informed Defendant Curtiss that during inmate processing, female officers only search the inmates' clothing and the inmates remain in their boxers.

31. Defendant Curtiss stated that after the inmates' clothing is searched, they move to the other side of work change, away from the female officers, and the male officers conduct the unclothed body search.

32. Defendant Curtiss stated that the work change officer position is not gender specific and female officers have the right to work in those positions.

33. Defendant Curtiss did not interview any inmates who came through work change on February 27, and 28, 2007.

34. Plaintiff's documentation was reviewed, his allegations were reviewed and evaluated by administrative staff, and the fact finding investigation was completed at the first level of review.

35. On March 26, 2007, Defendant Curtiss denied Plaintiff's inmate appeal grieving cross-gender strip searches.

///

36.  Defendant Curtiss has been inside the area while inmates underwent unclothed body searches and female staff have been in the building at the same time.

37.  Defendant Wan was the Associate Warden of Central Services at CSATF in 2007.

38.  One of Defendant Wan's duties was to oversee the daily operations of Central Services, including "B" facility work change.

39.  Defendant Wan was aware that in 2007, female staff were sometimes assigned to the "B" facility work change area.

40.  Female staff members are allowed to be inside the work change area while inmates undergo unclothed body searches.

41.  Defendant Wan was aware that female staff were assigned to work in the work change area.

42.  Pursuant to CDCR policy, inmates will not be subject to unclothed body searches by staff of the opposite sex except during emergency situations.

43.  Defendant Swinford, Bonilla, Lara, Curtiss, and Wan are aware of CDCR policies regarding correctional staff conducting unclothed body searches on inmates of the opposite sex.

### 4.   Discussion

Plaintiff bears the burden of proof at trial and therefore, to prevail on his summary judgment motion, he must affirmatively demonstrate that no reasonable trier of fact could find other than for him. Soremekun, 509 F.3d at 984.  In this instance, Plaintiff has not met his initial burden of production.[5]  It is clear from Plaintiff's motion that the facts material to his claim that Defendants violated his Fourth Amendment rights by conducting and permitting cross-gender strip searches are in dispute.

Specifically, Plaintiff's motion and the accompanying evidence demonstrate that Defendants dispute Plaintiff's position that he was strip searched by Defendant Swinford on February 27, 2007, and by Defendant Lara on February 28, 2007.  (Pruitt Dec., court record pp. 60-62, ¶¶2-4.)  While Defendants concede that officers standing behind the counter *could* look over the counter to view

---

[5] The Court does not reach the arguments in Defendants' opposition or Plaintiff's reply given that Plaintiff failed to meet his initial burden as the party moving for relief.  The Court did, however, review Defendants' response to Plaintiff's statement of undisputed facts.

inmates nude, Defendants Swinford, Lara, and Bonilla deny ever strip searching male inmates, viewing male inmates nude, or being present while Plaintiff was strip searched; and Defendants Curtiss and Wan deny that female officers conduct strip searches of male inmates or view male inmates nude.  (Doc. 49, Motion, Swinford RFAs 5, set one, p. 66; Swinford ROGs 7, 11, set one, supp. resp., p. 76; Lara RFA 5, p. 106; Bonilla ROGs 6, 7, set one, p. 116; Bonilla RFAs 5, 6, p. 126-27; Bonilla ROG 6, p. 142; Curtiss ROG 5, set two, supp. resp., p. 156; Wan RFA 1, p. 163.)

As such, the Court finds that there are material facts in dispute and Plaintiff is not entitled to judgment as a matter of law on his claims.  Therefore, the Court recommends that Plaintiff's motion for summary judgment be denied.

## B.   Defendants' Cross-Motion

### 1.   Defendants' Statement of Undisputed Facts

1.   Defendants Swinford, Bonilla, and Lara were correctional officers at CSATF.

2.   Defendant Swinford was often assigned to the "B" facility work change area.

3.   Defendant Bonilla was briefly assigned to the "B" facility work change area.

4.   Defendant Lara was assigned as a vocational officer on "B" facility but would, on occasion, assist the staff in the "B" facility work change area with the processing of inmates.

5.   The "B" facility work change area at CSATF is a building used for processing inmates as they depart from and return to the yard for purposes such as prison jobs or medical appointments.

6.   During their jobs and medical appointments, inmates have access to many items that could be used to make things, such as weapons or drugs, which present a threat to the safety and security of the institution.

7.   For instance, inmates any have access to tools, pieces of metal, needles, medication, and other such items.

8.   Therefore, it is imperative that inmates returning to the yard undergo an unclothed body search to ensure that they are not smuggling any such contraband.

9.   Upon their return to the "B" facility work change area, inmates undergo an unclothed body search.

10.    The "B" facility work change area is a building approximately 20 feet by 20 feet, not including an attached bathroom and a foyer outside.[6]

11.    There were counters inside of the "B" facility work change area.

12.    To the average man, these counters were approximately waist-high.

13.    To the average woman, the counters were somewhat higher than waist-high.

14.    An inmate undergoing an unclothed body search would stand on one side of the counter while the officer conducting the search would stand on the other side of the counter.[7]

15.    During an unclothed body search, the standard practice in 2007 was for the inmate to remove his clothing so that it could be inspected by staff.

16.    A staff person then inspected the inmate's face, hair, ears, mouth, nose, body, armpits, hands, scrotum, genitals, legs, and feet.

17.    The inmate was then instructed by the inspecting officer to turn, bend at the waist, spread his buttocks, and cough.

18.    Departmental regulations stated that correctional employees, other than qualified medical staff, were not to conduct unclothed body searches of inmates of the opposite sex except under emergency conditions with life and death consequences.

19.    Female officers were permitted to work in the "B" facility work change area at CSATF, but consistent with departmental regulations, they were not permitted to conduct unclothed body searches or to view inmates while they underwent unclothed body searches.

20.    At least one male staff person would be present so as to conduct unclothed body searches of male inmates.

21.    Defendants Swinford and Bonilla worked in the "B" facility work change area on February 27, 2007, and February 28, 2007.

22.    Defendant Lara worked in the "B" facility work change area on February 28, 2007.

---

[6] Although Plaintiff attempts to bring this fact into dispute, his assertion that Defendants failed to submit any evidence is incorrect.  Defendants Swinford and Lara both attested to this fact, and no argument has been made that they do not have personal knowledge or competence to testify as to the fact.

[7] Plaintiff's contention that there is no evidence to support this fact is incorrect.  Defendants Swinford and Lara both attested to the fact and neither Plaintiff's amended complaint nor his declaration bring it into dispute.

23.   Defendant Curtiss has worked for the CDCR since 1997, and he was never the supervisor of the "B" facility work change area at CSATF.

24.   Defendant Curtiss was a correctional sergeant on "D" and "E" facilities.

25.   Around March 2007, Defendant Curtiss was assigned to interview Plaintiff and prepare a first level response to Plaintiff's inmate appeal.

26.   Plaintiff's appeal concerned an allegation that during processing through the "B" facility work change area, two female officers viewed Plaintiff while he was undergoing an unclothed body search.

27.   On March 26, 2007, Defendant Curtiss interviewed Plaintiff regarding his appeal and then prepared a first level response.

28.   In investigating Plaintiff's appeal, Defendant Curtiss interviewed staff from the "B" facility work change and he was informed that during inmate processing, the female officers search the clothing only and the inmates remain in their boxers.  Defendant Curtiss was also informed that after the inmates' clothes are searched, they move to the other side of work change away from the female officers and the male officers conduct the unclothed body searches.

29.   In 2007, Defendant Wan held the position of Associate Warden of Central Services at CSATF.

30.   In that position, Defendant Wan oversaw the operations of Central Services, including the "B" facility work change area.

31.   Defendant Wan knew that female staff were at times assigned to the "B" facility work change area, but he also knew that pursuant to the standard practice for processing inmates, female staff were not permitted to conduct unclothed body searches or to view inmates while they underwent unclothed body searches.

32.   Defendant Wan had no knowledge that unclothed body searches were being conducted by female staff in the "B" facility work change area.

///

///

33.   Defendant Wan never conducted an unclothed body search of Plaintiff, never directed staff to conduct an unclothed body search of Plaintiff, and was not present during any unclothed body search of Plaintiff.

34.   Defendant Wan did not participate in the preparation of a response to Plaintiff's inmate appeal regarding unclothed body searches and never reviewed the appeal prior to this litigation.   The second page of the first level appeal response includes Defendant Wan's name under the signature line, but the signature on the line is not Wan's and it is followed by the term "AWCS(A)," indicating it was signed by someone temporarily acting in place of Wan as the Associate Warden for Central Services.[8]

       **2.**   **Discussion**

          **a.**   **Defendants Curtiss and Wan**

Defendants Curtiss and Wan may not be held liable for violating Plaintiff's rights under the Fourth Amendment unless they were personally involved, Ashcroft v. Iqbal, 556 U.S. 662, 676-77, 129 S.Ct. 1937, 1948-49 (2009); Jones v. Williams, 297 F.3d 930, 934 (9th Cir. 2002), and mere administrative review of an inmate appeal grieving past misconduct generally provides no basis for the imposition of liability under section 1983, George v. Smith, 507 F.3d 605, 609 (7th Cir. 2007). However, a supervisor may be held liable if he "participated in or directed the violations, or knew of the violations and failed to act to prevent them," Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989); accord Starr v. Baca, 652 F.3d 1202, 1205-08 (9th Cir. 2011); Corales v. Bennett, 567 F.3d 554, 570 (9th Cir. 2009); Preschooler II v. Clark County School Board of Trustees, 479 F.3d 1175, 1182 (9th Cir. 2007); Harris v. Roderick, 126 F.3d 1189, 1204 (9th Cir. 1997), and the Court found that Plaintiff stated a claim against Defendants Curtiss and Wan specifically because Plaintiff alleged that Defendant Curtiss was the work change sergeant and he defended the practice on the ground that female officers have the right to hold positions in work change, and that Defendant Wan was in

---

[8] Plaintiff disputes that Defendant Wan did not participate in responding to his appeal and he asserts that Defendant Wan signed the appeal.  This assertion, however, ignores the evidence presented by Defendants.  There is a signature line for Defendant Wan and this understandably led Plaintiff to believe Wan participated, but the signature does not appear to read "T. Wan," it is directly followed by a term indicating someone in an acting capacity signed, and the signature bears no resemblance to the signature on Defendant Wan's declaration.  In short, Plaintiff has submitted no admissible evidence bringing this fact into dispute.

charge of the work change policies and agreed with Curtiss's resolution of the appeal.[9]   (Doc. 9, F&R, 7:17-27.)   The Court found that Defendants Curtiss and Wan allegedly had authority over work change and its policies and practices, and were aware that routine cross-gender strip searches were taking place.   (Id.)   That was the pleading stage, however, and the evidence has not borne out Plaintiff's allegations regarding the authority and the involvement of Defendants Curtiss and Wan.

Construing the evidence in the light most favorable to Plaintiff, Defendants Swinford and Lara each strip searched him once and Defendant Bonilla watched both times.   However, Plaintiff has adduced no evidence that Defendants Curtiss and Wan were aware that cross-gender strip searches were routinely occurring but failed to intervene.

Defendants have presented evidence that Defendant Curtiss was never the supervisor of the "B" facility work change area at CSATF, as alleged by Plaintiff.   Rather, Defendant Curtiss was a correctional sergeant on "D" and "E" facilities, and he was merely assigned to interview Plaintiff and prepare a first level response to Plaintiff's inmate appeal, which complained that female officers were present in work change during strip searches.

Defendant Wan was the Associate Warden of Central Services at CSATF in 2007, and he oversaw the operations of Central Services, including the "B" facility work change area. Defendants' evidence shows that while Defendant Wan knew that female staff were at times assigned to the "B" facility work change area, female staff were not permitted to conduct unclothed body searches or to view inmates while they underwent unclothed body searches.   Defendant Wan denies having any knowledge that unclothed body searches were being conducted by female staff in the "B" facility work change area; and he attests that he never conducted an unclothed body search of Plaintiff or directed staff to conduct an unclothed body search of Plaintiff, and he was not present during any unclothed body search of Plaintiff.   Furthermore, Defendant Wan did not participate in the preparation of a response to Plaintiff's inmate appeal regarding unclothed body searches and he never reviewed the appeal prior to this litigation.   Rather, someone else temporarily acting in his place as the Associate Warden for Central Services signed off on the appeal.

---

[9] The Court's screening decisions made clear that the basis for liability was a supervisory liability theory, not the mere, isolated involvement in responding to the appeal.

Plaintiff has not submitted any evidence controverting the facts set forth by Defendants. Plaintiff cannot rely on the general, unsupported allegations in his amended complaint and declaration to support his claim. Defendants have shown that Defendant Curtiss was not a supervisor for the "B" facility work change area and his involvement was limited to investigating and preparing a response to Plaintiff's inmate appeal in March 2007, which is not a basis for imposing liability on him for the violation of Plaintiff's Fourth Amendment rights on February 27, 2007, and February 28, 2007. Defendants have also shown that Defendant Wan, although having supervisory authority over the "B" facility work change area, was not involved in responding to Plaintiff's appeal, was not involved in the strip searches on February 27, 2007, and February 28, 2007, and was not aware of any routine cross-gender strip searches occurring.

Therefore, Defendants Curtiss and Wan are entitled to judgment as a matter of law on Plaintiff's Fourth Amendment claim against them.

### b.   Defendants Swinford, Lara, and Bonilla

#### 1)   Defendants' Position

There is no dispute in this case that routinely strip searching inmates as they returned to the "B" facility yard from their prison jobs, medical appointments, or other activities served the legitimate correctional goal of preventing contraband, given that inmates were able to access items such as tools, pieces of metal, needles, medication, and other such items from which they could make such things as weapons or drugs and thereby present a threat to the safety and security of the institution.

There is also no dispute that departmental regulations prohibited correctional employees, other than qualified medical staff, from conducting unclothed body searches of inmates of the opposite sex except under emergency conditions with life and death consequences, and that while female officers were permitted to work in the "B" facility work change area at CSATF, they were not permitted to conduct unclothed body searches or to view inmates while they underwent unclothed body searches.

Defendants submit evidence that there was a standard practice in place in the "B" facility work change to ensure that female staff did not view male inmates when they were naked. Pursuant

to this standard practice, the unclothed body searches would be performed by male staff in the work change area, and while the searches were being performed, female staff would stand on the opposite side of the counter from the inmates, approximately 6 feet away, with their backs turned. Female staff would work at various administrative and clerical tasks, such as answering the phone and processing gate passes. From this position, female staff could not see the inmates as they underwent the unclothed body searches and even if a female staff member turned around, she could not see the inmates' lower bodies due to the counter.

Defendants also submit evidence that staff assigned to the work change area would search the clothing of inmates being processed. The search of the clothing would generally be conducted by the same officer conducting the unclothed body search of the inmate. If there was a large number of inmates to process and few male officers present to conduct the unclothed body searches, a female officer would assist at times by inspecting the clothing of the inmate. She would not see the inmate naked, as the inmate would remain in his boxer shorts. After the inmate's clothing was searched, he would then move to the other side of the work change area, away from the female officers, so that a male officer could conduct the unclothed body search.

Finally, Defendants Swinford and Bonilla worked in the "B" facility work change area on February 27, 2007, and February 28, 2007, and Defendant Lara worked in the "B" facility work change area on February 28, 2007. However, Defendants deny ever strip searching male inmates or viewing male inmates nude, and they deny ever strip searching Plaintiff or viewing him nude. Defendants contend that if Plaintiff was processed through work change on either day, they would have been acting pursuant to standard practice and been engaged in administrative tasks on the opposite side of the counter with their backs turned.

Defendants argue that as they neither strip searched Plaintiff nor viewed him nude, they are entitled to judgment as a matter of law.

///

2)      **Plaintiff's Position**[10]

Plaintiff attests that Defendant Swinford strip searched him on February 27, 2007, and Defendant Lara strip searched him on February 28, 2007, while Defendant Bonilla was present and watched the strip searches on both days.  (Doc. 8, Amend. Comp., ¶¶10-15; Doc. 49, Pruitt Dec., ¶¶2-4, pp. 60-61.)  During both strip searches, Plaintiff was required to disrobe completely, lift his arms up, open his mouth, lift his testicles, turn around, lift his feet, and bend over, spread his buttocks and cough.  (Amend. Comp., ¶13, 14, 19; Pruitt Dec., ¶¶3, 4.)  Plaintiff also submits additional evidence that cross-gender strip searches occurred on the "B" facility work change and they were not limited to the searches of Plaintiff on February 27, 2007, and February 28, 2007.  (Doc. 49, Motion, Decs. of Green, Stephenson, Walker, & Wells, pp. 36-39.)

3)      **Findings**

In this case, the parties dispute whether Defendant Swinford strip searched Plaintiff on February 27, 2007, and Defendant Lara strip searched Plaintiff on February 28, 2007, and whether Defendant Bonilla watched both searches.  This dispute is clearly material and therefore, Defendants Swinford, Lara, and Bonilla are not entitled to judgment as a matter of law on Plaintiff's Fourth Amendment claim.

c.      **Qualified Immunity**

1)      **Two-Part Inquiry**

Defendants Swinford, Lara, and Bonilla also move for judgment on the ground of qualified immunity.  Qualified immunity is "immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial."  Mueller v. Auker, 576 F.3d 979, 993 (9th Cir. 2009) (citation and internal quotations omitted).  Qualified immunity shields government officials from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727 (1982).  "Qualified immunity

---

[10] Plaintiff's opposition to Defendants' cross-motion for summary judgment is not verified and it is not accompanied by any evidence.  However, Plaintiff's amended complaint is verified and his motion for summary judgment is accompanied by evidence.

balances two important interests - the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably," Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808 (2009), and it protects "all but the plainly incompetent or those who knowingly violate the law," Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092 (1986).

In resolving the claim of qualified immunity, the Court must determine whether, taken in the light most favorable to Plaintiff, Defendants Swinford, Lara, and Bonilla's conduct violated a constitutional right, and if so, whether the right was clearly established. Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151 (2001); Mueller, 576 F.3d at 993. While often beneficial to address in that order, the Court has discretion to address the two-step inquiry in the order it deems most suitable under the circumstances. Pearson, 555 U.S. at 236 (overruling holding in Saucier that the two-step inquiry must be conducted in that order, and the second step is reached only if the court first finds a constitutional violation); Mueller, 576 F.3d at 993-94.

In this instance, the Court elects to proceed directly to the second step of the inquiry and determine whether Plaintiff's Fourth Amendment right to be free from routine cross-gender strip searches and/or cross-gender viewing was clearly established in 2007. Phillips v. Hust, 588 F.3d 652, 655 (9th Cir. 2009) (courts have the discretion to proceed directly to the qualified immunity question); Somers v. Thurman, 109 F.3d 614, 622 (9th Cir. 1997) (declining to determine whether Fourth Amendment right to be free from cross-gender strip searches existed because there was no question it was not clearly established).

### 2)   Clearly Established Right

"For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right." Hope v. Pelzer, 536 U.S. 730, 739, 122 S.Ct. 2508, 2515 (2002). While the reasonableness inquiry may not be undertaken as a broad, general proposition, neither is official action entitled to protection "unless the very action in question has previously been held unlawful." Hope, 536 U.S. at 739. "Specificity only requires that the unlawfulness be apparent under preexisting law," Clement v. Gomez, 298 F.3d 898, 906 (9th Cir. 2002) (citation omitted), and prison personnel "can still be on notice that their

conduct violates established law even in novel factual circumstances," Hope, 536 U.S. at 741. The salient question is whether the state of the law in 2007 gave Defendants fair warning that they were not permitted, in non-emergencies, to conduct cross-gender strip searches or to be present during cross-gender strip searches. Hope, 536 U.S. at 741 (quotation marks omitted).

In 1985, the Ninth Circuit considered the claim by male inmates that female officers were viewing them partially or totally nude while dressing, showering, being strip searched, or using the toilet, in violation of their right to privacy. Grummett v. Rushen, 779 F.2d 491, 492 (9th Cir. 1985). Relying on its decision in York v. Story, in which it recognized a right to bodily privacy implicit in the Due Process Clause of the Fourteenth Amendment, the Ninth Circuit assumed an interest in shielding one's body from members of the opposite sex, protected by the right of privacy. Grummett, 779 F.2d at 494. In finding no Fourth or Fourteenth Amendment violation and affirming the district court's decision granting summary judgment for prison officials, the Ninth Circuit discussed the circumstances in which female officers were observing male inmates. Id. at 494-96. Female officers were not assigned to positions requiring unrestricted and frequent surveillance and instead, they were in positions requiring only infrequent and casual observation, or observation from a distance. Id. at 494 (quotation marks omitted). Female officers did not conduct or observe strip or body cavity searches, with the exception of two or three emergency situations, and the pat-down searches they conducted did not involve intimate contact with inmates' bodies and were handled professionally. Id. at 495 (quotation marks omitted).

In 1988, the Ninth Circuit considered a challenge to frequent, routine strip searches on the grounds that they were unreasonable and that they violated inmates' right to privacy because they were conducted within the view of female officers. Michenfelder, 860 F.2d at 333. In addition, the plaintiff challenged the stationing of female officers on shower duty. Id. In Michenfelder, the visual body cavity searches at issue took place in the maximum security unit and were conducted every time an inmate left or returned to the unit. Id. at 332. Female officers did not conduct strip searches except in emergencies and they were not routinely present for the searches, but they were stationed in positions controlling cell doors and monitoring the tiers via video screen. Id. at 330. For those controlling cell doors, the searches were visible through a small window; and in the event that female

officers monitoring the tiers violated prison policy and closely watched the searches, they would at most have an indistinct, limited view via the video monitors. Id. at 330, 334. The Ninth Circuit also found that "[e]vidence of female officers' role in shower duty likewise did not establish an inappropriate amount of contact with disrobed prisoners." Id. at 334.

In Michenfelder, the Ninth Circuit recognized "that incarcerated prisoners retain a limited right to bodily privacy," but found that the searches were reasonable and neither the searches nor the employment of female guards on shower duty violated inmates' right to privacy. Id. at 333-34. It found that the prison's division of responsibilities between male and female guards represented a reasonable attempt to accommodate the tension between inmates' privacy concerns and the prison's internal security needs and equal employment concerns. Id. at 334.

In 1992, the Ninth Circuit considered a female parolee's claim that a male parole officer violated her right to bodily privacy by entering the bathroom stall and observing her provide a urine sample while she was partially nude and seated on the toilet. Sepulveda v. Ramirez, 967 F.2d 1413, 1415 (9th Cir. 1992). The Ninth Circuit found that the officer was not entitled to qualified immunity because the female parolee's right to bodily privacy was clearly established by 1988. Sepulveda, 967 F.2d at 1415-16.

Then, in 1997, the Ninth Circuit considered a Fourth Amendment claim arising out of cross-gender strip searches in which, as here, female officers directly participated. Somers, 109 F.3d at 616. In Somers, a male inmate alleged that female officers were regularly subjecting him to non-emergency visual body cavity searches, in contravention of prison regulations, which permitted cross-gender unclothed body inspections only in emergency conditions. Id. Further, the female officers pointed at the plaintiff and made jokes amongst themselves. Id.

The district court found that the female officers violated the inmate's clearly established constitutional rights and the court denied them qualified immunity. Id. Although the Ninth Circuit acknowledged its earlier decisions in Grummett, Michenfelder, and Sepulveda might be read to suggest that up close, frequent, and intentional viewing of male prisoners by female officers could violate an inmate's privacy rights, it reversed the district court and granted the officers qualified immunity. Id. at 620 (quotation marks omitted). The Ninth Circuit cited the different direction taken

1  in Jordan v. Gardner, in which an en banc panel of the Ninth Circuit stated that while inmates may

2  have protected privacy interests in freedom from cross-gender strip searches, such interests had not

3  been judicially recognized and inmates' legitimate expectations of bodily privacy from persons of

4  the opposite sex were extremely limited.[11]  Id. at 620 (citing Jordan v. Gardner, 986 F.2d 1521, 1524-

5  25 (9th Cir. 1993) (en banc)) (quotation marks omitted).

6         Relying on the Jordan decision, the Ninth Circuit held in Somers that the female officers

7  were entitled to qualified immunity because in 1993 when the conduct occurred, male inmates did

8  not have a clearly established Fourth Amendment privacy interest prohibiting cross-gender strip

9  searches.  Id.  The Ninth Circuit further stated that even in 1997, it was highly questionable whether

10  inmates had a Fourth Amendment right to be free from routine cross-gender unclothed searches or

11  from being viewed unclothed by officers of the opposite sex.  Id. at 622.

12        It bears repeating that "[q]ualified immunity gives government officials breathing room to

13  make reasonable but mistaken judgment about open legal questions."  Ashcroft v. al-Kidd, __ U.S.

14  __, __, 131 S.Ct. 2074, 2085 (2011).  "It is thoroughly inconsistent with the rationale underlying the

15  doctrine of qualified immunity to hold individuals personally liable for conduct not previously

16  clearly identified as unlawful," and "government officials are not required to anticipate subsequent

17  legal developments."  Somers, 109 F.3d at 621.  "Government officials cannot fairly be said to know

18  the law unless it is sufficiently unmistakable from authoritative sources," and "[i]t is not even

19  enough to demonstrate that the constitutional norm relied on is the logical extension of principles

20  and decisions already in the books."  Id. at 621-22 (citations omitted).

21        The Ninth Circuit's most recent decision in Byrd represents a sharp departure from Somers,

22  and reasonable government officials will wisely note that sharp departure.[12]  In as much as the Ninth

23  Circuit has now held that non-emergency cross-gender strip searches are unconstitutional as a matter

---

[11] In Jordan, the Ninth Circuit did not ultimately reach the female inmates' Fourth Amendment claims because it found the cross-gender searches by male officers violated the Eighth Amendment, but in discussing the Fourth Amendment, it declined to assume that because the searches caused immense anguish, they necessarily violated the Fourth Amendment.  Jordan, 986 F.2d at 1524-25.

[12] The Court notes that Defendants failed to acknowledge the Byrd decision in their cross-motion for summary judgment, despite its clear relevance.

of law, it is perhaps only the unwise who will continue to risk participating in or permitting the practice of routine, non-emergency cross-gender strip searches, regardless of prison staffing concerns, including equal employment opportunity concerns.[13]

Nevertheless, the Byrd decision was issued in 2011.  In 2007, at the time of the events at issue here, Somers was controlling and directly on point with respect to routine body cavity searches of male inmates by female officers.  The Court finds that in 2007, the pre-existing law did not give Defendants fair warning that it was unlawful to occasionally conduct routine cross-gender strip searches and it necessarily follows that it was not clearly established that the less direct participation of simply being present was unlawful.[14]

Therefore, the Court finds that assuming Plaintiff was subjected to routine cross-gender strip searches by Defendants Swinford and Lara in the presence of Defendant Bonilla, as he alleges, Defendants are entitled to qualified immunity.

## IV.   Recommendation

For the reasons set forth above, the Court HEREBY RECOMMENDS that:

1.      Plaintiff's motion for summary judgment, filed on January 3, 2012, be DENIED; and

2.      Defendants' motion for summary judgment, filed on April 2, 2012, be:

    a.      GRANTED as to Plaintiff's Fourth Amendment claim against Defendants Curtiss and Wan; and

    b.      DENIED as to Plaintiff's Fourth Amendment claim against Defendants Swinford, Lara, and Bonilla in light of the existence of material factual disputes, but GRANTED as to Defendants Swinford, Lara, and Bonilla on the ground of qualified immunity, thus concluding this action in its entirety.

///

---

[13] While the Byrd decision may arguably be limited to its facts, the cross-gender search at issue was only a one-time event and there was no evidence that the officers ridiculed or otherwise abused the inmates.  Byrd, 629 F.3d at 1143-47.  Also, although the inmates were wearing boxer shorts, the Ninth Circuit nonetheless found the search to be a strip search.  Id. at 1142.  These factors suggest it may be a difficult task to distinguish Byrd from other routine, non-emergency cross-gender strip searches in a prison setting.  Id. at 1146-47.

[14] This case involves no allegations that the searches were conducted unprofessionally or were otherwise abusive.  It is merely the cross-gender nature of the searches which is at issue.

1        These Findings and Recommendations will be submitted to the United States District Judge

2  assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within **thirty (30)**

3  **days** after being served with these Findings and Recommendations, the parties may file written

4  objections with the Court.  The document should be captioned "Objections to Magistrate Judge's

5  Findings and Recommendations."  The parties are advised that failure to file objections within the

6  specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d

7  1153 (9th Cir. 1991).

8

9  IT IS SO ORDERED.

10  **Dated:   August 1, 2012**                  **/s/ Sheila K. Oberto**

                                    UNITED STATES MAGISTRATE JUDGE